UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:15-cr-00069-JCM-NJK |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT &  RECOMMENDATION |
| | ) | |
| BING HAN, | ) | (Docket No. 38) |
| Defendant. | ) | |
| | ) | |

This matter was referred to the undersigned Magistrate Judge on Defendant Bing Han's Motion to Suppress Evidence and Statements. Docket No. 38. On February 10, 2016, the Court held an evidentiary hearing on Defendant's motion.   Docket No. 97.   The Court has considered Defendant's Motion, the United States' Response, the evidence adduced at the evidentiary hearing on this matter, and the parties' arguments.  Docket Nos. 38, 63, 97.[1]  No Reply was filed.  *See* Docket.

I.    **BACKGROUND**

A.    **Testimony of Detective Willis Sylva**

On February 20, 2015, Las Vegas Metropolitan Police Department (LVMPD) Detective Willis Sylva who was, at the time, assigned to narcotics, was notified that another narcotics squad was executing several search warrants, and needed extra people to maintain surveillance on 4701 Del

---

[1]Citations to the recording of the hearing are noted by "Hearing Tr." followed by the relevant date and time of the hearing, as no written transcript has been prepared.

Monte, a residence that had not yet been searched. Hearing Tr. (2/9/2016) at 9:56 - 9:57 a.m. Detective Sylvan was designated the eye - meaning that he was the surveilling officer who was able to see the front of the residence. Hearing Tr. (2/9/2016) at 9:57 a.m. The residence sits back from the street, and has a chain link fence in the front. Hearing Tr. (2/9/2016) at 9:57 a.m. The neighborhood is dark, with few street lights. Hearing Tr. (2/9/2016) at 9:57 a.m. Detective Sylva was wearing plain clothes, was alone in his vehicle, and was parked in an unmarked vehicle on the north side of the street west of the residence. He had an angled view of the residence, and could see the front of the house. Hearing Tr. (2/9/2016) at 9:58 a.m.; 10:08 a.m. Detective Sylva conducted his surveillance at night while it was dark outside, and the house was poorly lit with no street light on its side of the street. Detective Sylva could see the gate in front of the house, but the house itself was dark. Hearing Tr. (2/9/2016) at 9:58 - 9:59 a.m.; 10:05 a.m.

While conducting his surveillance, Detective Sylva observed a minivan drive westbound on Del Monte. Hearing Tr. (2/9/2016) at 9:59 a.m. The vehicle slowed down in front of the residence at 4107 Del Monte, drove past the lit area, and stopped in a darker area. Hearing Tr. (2/9/2016) at 10:00 a.m. Detective Sylva observed that the male driver (whom Detective Sylva identified as Defendant Bing Han)[2] exited the vehicle, and then a female exited the passenger side of the vehicle and got into the driver's seat. Hearing Tr. (2/9/2016) at 10:00 a.m. After a short conversation between the two, the vehicle drove westbound toward Arville while Defendant, who remained behind, crossed the street and walked into the yard of 4107 Del Monte. Hearing Tr. (2/9/2016) at 10:00 a.m. Defendant went through the chain-link fence and walked toward the house, after which point Detective Sylva could no longer see him because it was too dark. Hearing Tr. (2/9/2016) at 10:01 a.m.; 10:06 - 10:07 a.m. As soon as Detective Sylva noticed the minivan, he began communicating the information over the police radio to other surveillance officers in the area, giving them a "play-by-play" of the events he was observing. Hearing Tr. (2/9/2016) at 10:01 a.m.

After Defendant went to the front of the house, he came back out in less than five minutes. Hearing Tr. (2/9/2016) at 10:02 a.m.; 10:07 a.m. During this entire time, Detective Sylva remained

---

[2]Hearing Tr. (2/9/2016) at 10:03 a.m.

1   in his vehicle surveilling the property.  Hearing Tr. (2/9/2016) at 10:07 a.m.  Defendant, who was

2   talking on his phone in a language that was not English, walked quickly away from the house and

3   crossed the street in front of Detective Sylva's vehicle.  Hearing Tr. (2/9/2016) at 10:02 a.m.; 10:08 -

4   10:09 a.m.  Defendant then slowed down and began pacing, "as if he was looking around for

5   something."  Hearing Tr. (2/9/2016) at 10:02 a.m.  During his pacing, Defendant walked toward

6   Detective Sylva's vehicle, looked inside, and immediately turned away.  Hearing Tr. (2/9/2016) at

7   10:01 a.m.

8        After relaying the information over the radio, at that point, Detective Sylva was told to detain

9   Defendant.  Hearing Tr. (2/9/2016) at 10:02 - 10:03 a.m.  Detective Sylva exited his vehicle wearing

10  a yellow Metro jacket; he held his badge out and identified himself as a police officer and said that

11  he needed Defendant to come over to him.  Hearing Tr. (2/9/2016) at 10:03 - 10:04 a.m.; 10:08 a.m.

12  Defendant looked at Detective Sylva, froze, and continued talking on his phone.  Detective Sylva

13  pulled his gun out and held it at his side, not pointed at Defendant, and repeated that he needed

14  Defendant to go to him.  Hearing Tr. (2/9/2016) at 10:03 - 10:04 a.m.; 10:09 a.m.  Detective Sylva

15  was unsure as to whether Defendant would try to flee, since he did not respond to the detective's

16  requests.  Hearing Tr. (2/9/2016) at 10:09 a.m.  Detective McHale then arrived and took Defendant

17  into custody.  Hearing Tr. (2/9/2016) at 10:03 - 10:04 a.m.  Defendant was handcuffed and placed

18  into a vehicle and moved to a different location so that Detective Sylva could continue his

19  surveillance on the residence.  Hearing Tr. (2/9/2016) at 10:10 a.m.

20       Detective Sylva does not recall conducting a search of Defendant and, to his knowledge,

21  Defendant did not possess keys to the Del Monte residence.  Hearing Tr. (2/9/2016) at 10:11 a.m.

22  Defendant made no statements in Detective Sylva's presence.  Hearing Tr. (2/9/2016) at 10:11 a.m.

23       **B.**     **Testimony of Detective Steven Balonek**

24       On February 20, 2015, LVMPD Detective Steven Balonek who, at the time, was in narcotics,

25  was assigned to assist a narcotic grow team in conducting surveillance on the residence at 4107 Del

26  Monte.  Hearing Tr. (2/9/2016) at 10:14 a.m.  Detective Balonek was aware that a search warrant

27  had been executed on a separate residence that day and that a marijuana grow had been located.  He

28  was present at the instant surveillance because officers were still processing the prior scene and

1    needed assistance in surveilling the Del Monte residence.  Hearing Tr. (2/9/2016) at 10:23 - 10:24

2    a.m.  Detective Balonek knew that both the residence where the first search warrant was executed

3    and the Del Monte residence were owned by the same person and that, during the search of the first

4    residence, officers found an electrical bill for the Del Monte residence.  Hearing Tr. (2/9/2016) at

5    10:24 a.m.

6         Prior to setting up the Del Monte surveillance, a detective spoke with neighbors.  Hearing

7    Tr. (2/9/2016) at 10:27 - 10:28 a.m.  The neighbors stated that an Asian male, approximately 40-50

8    years old, was coming and going from the Del Monte residence during the day, staying at the

9    residence for only small amounts of time.  Hearing Tr. (2/9/2016) at 10:28 a.m.  The neighbors

10   further stated that they smelled a "skunky" smell coming from the residence, and that the smell had

11   not been there before the current occupants took control of the residence.  Hearing Tr. (2/9/2016) at

12   10:28 a.m.  This information was relayed to Detective Bachman, the detective in charge of the case.

13   Hearing Tr. (2/9/2016) at 10:28 a.m.

14        During the Del Monte surveillance, Detective Sylva was the eye and the rest of the

15   surveillance team surrounded the residence - not "right of top of it, but spread out," in the event

16   someone arrived at the residence, so they could conduct a stop of that person or vehicle.  Hearing

17   Tr. (2/9/2016) at 10:14 a.m.  Detective Balonek could not see the residence from his location, but

18   was in radio communication with Detective Sylva, who updated the surveillance team over the radio

19   approximately every 15-20 minutes, if he saw any changes or anyone who arrived at the residence.

20   Hearing Tr. (2/9/2016) at 10:14 - 10:15 a.m.

21        At some point, Detective Sylva notified the surveillance team over the radio of the arrival

22   of the minivan, that the driver exited the vehicle and walked away, and that the passenger moved to

23   the driver's seat.  Hearing Tr. (2/9/2016) at 10:15 - 10:16 a.m.  Detective Balonek could not see the

24   arrival of the minivan, but he did see its departure from the residence.  Hearing Tr. (2/9/2016) at

25   10:15 a.m., 10:29 a.m.  Detective Balonek began surveilling the minivan after it left the residence.

26   Hearing Tr. (2/9/2016) at 10:16 a.m.  About three or four unmarked police vehicles followed the

27   minivan.  Hearing Tr. (2/9/2016) at 10:19 a.m.  Officers stopped the vehicle at a Walmart store just

28   west of the Del Monte residence.  Hearing Tr. (2/9/2016) at 10:16 - 10:17 a.m.  The vehicle did not

take the most direct route to Walmart, and it appeared to Detective Balonek that the driver was taking her time to delay her arrival at the Walmart.  The vehicle drove at or below the posted speed limit, and took a long time to get to the Walmart.  Hearing Tr. (2/9/2016) at 10:18 a.m.  Although the drive from the residence to Walmart should have taken approximately two to three minutes, it took the minivan approximately five to seven minutes to make the drive.  Hearing Tr. (2/9/2016) at 10:34 - 10:35 a.m.   Additionally, after the vehicle turned into the Walmart parking lot, instead of taking a direct route to a parking spot, it drove south toward the front of the store, across the front of the store, and then up an aisle.  The vehicle passed several open spots, and parked far from the Walmart.  Hearing Tr. (2/9/2016) at 10:17 a.m.; 10:35 a.m.

Once the minivan parked, police vehicles blocked it into its parking space - Detective Balonek's vehicle was in front, and Detective Wright parked behind the minivan.  Hearing Tr. (2/9/2016) at 10:20 a.m.; 10:29 a.m.  The officers, who had badges around their necks, identified themselves as they approached the minivan and contacted the Asian female driver - Ms. Tian. Hearing Tr. (2/9/2016) at 10:20 a.m.  Ms. Tian told officers that she had come from a house around the corner, and had gone to the Walmart "to get things."  Hearing Tr. (2/9/2016) at 10:21 a.m. Detective Balonek told Ms. Tian that they had followed her from a residence, and she said she had just dropped her boyfriend off at that location, so he could feed the dogs.  Hearing Tr. (2/9/2016) at 10:22 a.m.  At that point, one of the officers asked Ms. Tian why she had come to the Walmart, and she said she was there to get dog food.  Hearing Tr. (2/9/2016) at 10:22 a.m.  When officers asked Ms. Tian if that location was her boyfriend's residence, she said she was not sure.  Hearing Tr. (2/9/2016) at 10:22 a.m.

Ms. Tian said that, earlier that day while at the Fashion Show Mall with girlfriends, she received a phone call from her boyfriend.  As a result of the phone call, either she picked him up or he picked her up, and they drove to the Del Monte address.  Hearing Tr. (2/9/2016) at 10:23 a.m. Defendant told Ms. Tian that, after dropping him off, she should wait in the area until he called her to pick him up.  Hearing Tr. (2/9/2016) at 10:35 a.m.  Ms. Tian did not tell officers that Defendant told her to pick up dog food.  Hearing Tr. (2/9/2016) at 10:35 a.m.

1    Detective Balonek told Ms. Tian that it is not normal behavior to just drop someone off

2    unless something else was going on, and asked her if anything illegal was happening at the residence

3    or anywhere else involving her boyfriend.  Hearing Tr. (2/9/2016) at 10:25 a.m.  Ms. Tian said she

4    was aware that there was a marijuana grow operation both at the Del Monte residence and another

5    address.  Hearing Tr. (2/9/2016) at 10:25 a.m.; 10:33 a.m.  Detectives spoke with Ms. Tian for

6    approximately 45-50 minutes, and Detective Balonek relayed the information via phone to Detective

7    Bachman, the detective in charge of the case, providing him with the exact content of Ms. Tian's

8    statement.  Hearing Tr. (2/9/2016) at 10:25 - 10:27 a.m.; 10:31 a.m.  After Ms. Tian spoke with

9    detectives, she left the location on her own.  Hearing Tr. (2/9/2016) at 10:27 a.m.

10   Detective Balonek had no contact with Defendant during this entire period of time.  Hearing

11   Tr. (2/9/2016) at 10:29 a.m.  His contact was solely with Ms. Tian.  Hearing Tr. (2/9/2016) at 10:28

12   a.m.  Detective Balonek was outside his vehicle and had no radio contact during the time he spoke

13   with Ms. Tian.  Hearing Tr. (2/9/2016) at 10:30 - 10:31 a.m.  He knew, however, that Defendant had

14   been detained sometime during the same timeframe.  Hearing Tr. (2/9/2016) at 10:31 a.m.

15   ### C.    Testimony of Detective Shannon McHale

16   On February 20, 2015, LVMPD Detective Shannon McHale who, at the time, was in

17   narcotics, was assigned surveillance duties regarding the residence at 4107 Del Monte.  Hearing Tr.

18   (2/9/2016) at 10:38 a.m.  Detective McHale knew that several search warrants were being executed

19   that day and that one would be executed on the Del Monte location, and was conducting surveillance

20   on the residence in case anyone arrived at that location prior to the execution of the search warrant.

21   Hearing Tr. (2/9/2016) at 10:38 - 10:39  a.m.  If that occurred, detectives planned to stop that person

22   in order to determine his or her relation to the residence.  Hearing Tr. (2/9/2016) at 10:39 a.m.  From

23   his training and experience, Detective McHale knew that, when officers execute search warrants on

24   multiple locations, word could get out about the search warrants and co-conspirators would have the

25   ability to destroy evidence at locations that have not yet been searched or flee the scene.  Hearing Tr.

26   (2/9/2016) at 10:39 a.m.  From his surveillance location, Detective McHale could see the property,

27   but not the front door.  Hearing Tr. (2/9/2016) at 10:41 a.m.  He saw the minivan pull up in front of

28   the property.  Hearing Tr. (2/9/2016) at 10:40 - 10:41 a.m.

1    The street was very dark with very little lighting and the residence sat back from the street.

2    Hearing Tr. (2/9/2016) at 10:40 a.m.  Detective Sylva stated, over the radio, that a male subject got

3    out of the minivan and walked up to the Del Monte property.  Hearing Tr. (2/9/2016) at 10:42 a.m.

4    He also told the other officers that a female passenger got into the driver's seat of the vehicle and

5    drove off eastbound, leaving the area.  Hearing Tr. (2/9/2016) at 10:43 a.m.  A very short time after

6    Detective Sylva radioed that the male subject walked up to the property, he radioed that the subject

7    was coming back and walking directly toward Detective Sylva.  Hearing Tr. (2/9/2016) at 10:44 a.m.

8    Officers decided to stop the male to determine who he is, as well as his relationship to the property.

9    Hearing Tr. (2/9/2016) at 10:44 a.m.

10    Detective McHale went to Detective Sylva's location, and both got out of their vehicles and

11    took Defendant into custody.  Hearing Tr. (2/9/2016) at 10:44 a.m.; 11:17 a.m.  This occurred within

12    minutes of Defendant's drop-off at the location.  Hearing Tr. (2/9/2016) at 11:19 a.m.  Detective

13    McHale got out of his vehicle wearing a yellow raid jacket with his weapon out and pointed down

14    by his side.  Hearing Tr. (2/9/2016) at 10:46 a.m.; 11:17 a.m.  Detective Sylva also had his firearm

15    down by his side.  Hearing Tr. (2/9/2016) at 11:16 a.m.  Detective Sylva gave Defendant commands,

16    and Detective McHale approached Defendant.  Hearing Tr. (2/9/2016) at 10:47 a.m.  Initially,

17    Defendant was startled, but Detectives Sylva and McHale got to him within seconds.  Hearing Tr.

18    (2/9/2016) at 11:17 - 11:18 a.m.  Detective Sylva placed handcuffs on Defendant.  Hearing Tr.

19    (2/9/2016) at 10:47 a.m.  Detective McHale conducted a pat-down of Defendant, and found no keys

20    on his person.  Hearing Tr. (2/9/2016) at 11:20 a.m.

21    Detective McHale placed Defendant in the front seat of his vehicle and drove him

22    approximately a half block away down a side street, because the officers did not want to conduct

23    police business right in front of the Del Monte residence.  Hearing Tr. (2/9/2016) at 10:44 a.m.;

24    10:46 - 10:47 a.m.; 11:20 a.m.[3]  The location where Defendant was stopped was within view of the

25    Del Monte residence.  Hearing Tr. (2/9/2016) at 10:48 a.m.  Two police officers in raid jackets

26    questioning Defendant in front of the residence would potentially scare away anyone who may

27    _____

28    [3]Detective Sylva remained at his location to maintain surveillance on the residence.  Hearing
Tr. (2/9/2016) at 10:45 a.m.

1   otherwise approach the residence, and could also result in danger to the officers if an approaching

2   co-conspirator was armed.  Hearing Tr. (2/9/2016) at 10:48 - 10:49 a.m.

3          After driving approximately half a block, Detective McHale removed Defendant from the

4   front seat and began speaking with him next to the vehicle, asking questions such as who Defendant

5   was and where he lived.  Hearing Tr. (2/9/2016) at 10:46 a.m.; 11:20 a.m.  Defendant initially

6   remained handcuffed, while Detective McHale determined his identity and confirmed through

7   records checks that he was not a wanted felon or violent.  Toward the middle of the conversation,

8   Defendant said that his shoulder hurt, and Detective McHale told him he was not free to go, warned

9   him not to do anything "silly," and removed the handcuffs.  Hearing Tr. (2/9/2016) at 10:49 - 10:50

10  a.m.

11         Detective McHale started the conversation by reiterating that he was a police officer, and

12  telling Defendant that he was conducting an investigation into the residence that Defendant had

13  approached.  Hearing Tr. (2/9/2016) at 10:50 a.m.  He asked Defendant if the Del Monte residence

14  was his house, and Defendant said no.  Hearing Tr. (2/9/2016) at 10:50 a.m.  Defendant told

15  Detective McHale that his girlfriend was driving the minivan, and that she dropped him off and left

16  the area because she had to go to work.  Hearing Tr. (2/9/2016) at 10:50 a.m.  At some point, a

17  Detective Getner drove up and Detective McHale relayed the basic information to him so that he

18  could relay it to Detective Bachman.  Hearing Tr. (2/9/2016) at 11:23 - 11:24 a.m.

19         Detective McHale stopped the discussion and read Defendant his *Miranda* rights verbatim

20  from his Department-issued card.  Hearing Tr. (2/9/2016) at 10:51 a.m.; 10:53 a.m.  He told

21  Defendant he had the right to remain silent, anything he said could be used against him in a court of

22  law, he had the right to have an attorney present during questioning, if he could not afford an

23  attorney one would be appointed for him, and he need not answer any questions without his attorney.

24  Hearing Tr. (2/9/2016) at 10:53 a.m.  After reading the rights, Detective McHale asked Defendant

25  if he understood them.  Hearing Tr. (2/9/2016) at 10:53 a.m.  Defendant said yes when asked if he

26  understood his rights, and wanted to continue the conversation.  Hearing Tr. (2/9/2016) at 10:56 a.m.

27  Defendant gave no indication that he did not understand his rights; in fact, he was excited to talk.

28  Hearing Tr. (2/9/2016) at 10:55 a.m.  Detective McHale speaks no Chinese and, therefore, only

1    spoke with Defendant in English.  Hearing Tr. (2/9/2016) at 10:53 - 10:54 a.m.  While Detective

2    McHale asked Defendant most questions, Defendant understood his questions and had no trouble

3    answering them; however, when he asked Defendant questions that could incriminate him, such as

4    questions about not feeding the dogs and leaving the house on foot, Defendant acted a little confused.

5    Hearing Tr. (2/9/2016) at 10:54 - 10:55 a.m.  Defendant spoke in English the entire time, and never

6    spoke in any other language.  Hearing Tr. (2/9/2016) at 10:56 a.m.  The conversation between the

7    two was "clear" - while it was obvious that English is not Defendant's first language, the two had

8    no problems communicating.  Hearing Tr. (2/9/2016) at 10:57 a.m.

9          Detective McHale did not have a weapon out during the conversation.  Hearing Tr.

10   (2/9/2016) at 10:57 a.m.  He did not make any threats or promises to Defendant in order to get

11   Defendant to make a statement.  Hearing Tr. (2/9/2016) at 10:57 a.m.  Defendant appeared agitated,

12   but not intoxicated or under the influence of any controlled substance.  Hearing Tr. (2/9/2016) at

13   10:58 a.m.  Prior to advising Defendant of his rights, Detective McHale solely asked basic questions

14   aimed at identifying Defendant, as well as initial safety questions, such as where the van went and

15   whether it was coming back, and if Defendant lived at the residence.  Hearing Tr. (2/9/2016) at 10:58

16   a.m.  Detective McHale did not know much about the investigation, and therefore, asked basic safety

17   and identification questions, and tried to determine that Defendant was not lying to him.  Hearing

18   Tr. (2/9/2016) at 10:59 a.m.

19         Defendant told Detective McHale that he had been in California all day because he drove a

20   tour bus and that, when he returned, he received a call from his father stating that he was in jail.

21   Defendant said he needed to feed the dogs.[4]  Hearing Tr. (2/9/2016) at 10:50 - 10:52 a.m.  Defendant

22   told Detective McHale that he does not live at that location.  Hearing Tr. (2/9/2016) at 10:50 a.m.

23   Defendant said that he did not have keys to the house, but that it did not matter because his father

24   stays in the small house behind the house.  Nonetheless, Defendant stated that he did not have keys

25   for that house either.  Detective McHale asked him how he planned to get inside without keys, and

26   if he had dog food.  Defendant said there should be dog food inside the house.  Hearing Tr.

27   _____

28         [4]The conversation about the dogs occurred post-*Miranda*.  Hearing Tr. (2/9/2016) at 11:21
     a.m.

(2/9/2016) at 10:52 a.m.  When Detective McHale asked Defendant if he fed the dogs, he said no.  Hearing Tr. (2/9/2016) at 10:52 a.m.  Detective McHale pointed out that Defendant was leaving on foot, had told the detective that he went to the residence to feed the dogs but did not feed the dogs, and had said that his girlfriend who was driving his vehicle went to work.  Detective McHale then asked Defendant what he was doing, but did not receive a clear answer, and noted that the question seemed to stump Defendant.  Hearing Tr. (2/9/2016) at 10:52 - 10:53 a.m.

Defendant never indicated, throughout the entire conversation, that he wanted to stop talking.  Hearing Tr. (2/9/2016) at 11:12 a.m.  Defendant never indicated that he wanted to exercise any of the rights of which Detective McHale had advised him.  Hearing Tr. (2/9/2016) at 11:12 a.m.  Rather, Defendant appeared eager to speak with Detective McHale.  Hearing Tr. (2/9/2016) at 11:12 a.m.

After speaking with Defendant, Detective McHale took him a block over to where some of the detectives who were working the case now were.  Hearing Tr. (2/9/2016) at 11:13 a.m.  Detective McHale left Defendant with Detective Bachman at that location after briefing Detective Bachman about Defendant's statement to him, and went back to the Del Monte residence to continue his surveillance.  Hearing Tr. (2/9/2016) at 11:14 a.m.; 11:24 a.m.; 11:28 a.m.  Approximately 35 minutes elapsed from the stop of Defendant until the handoff to Detective Bachman.  Hearing Tr. (2/9/2016) at 11:15 a.m.  Detective McHale is aware from reading one of the reports that Defendant subsequently told Detective Bachman that Defendant knew that marijuana was being grown inside the Del Monte residence.  Hearing Tr. (2/9/2016) at 11:13 - 11:14 a.m.; 11:21 - 11:22 a.m.

## II.   ANALYSIS

### A.   Credibility of Witnesses

The Court ordered an evidentiary hearing because the facts presented in the parties' briefing contradicted each other.  "The longstanding and repeated invocations in caselaw of the need of district courts to hear live testimony so as to further the accuracy and integrity of the factfinding process are not mere platitudes.   Rather, live testimony is the bedrock of the search for truth in our judicial system."  *United States v. Thoms*, 684 F.3d 893, 903 (9th Cir. 2012).  "[J]udges simply cannot decide whether a witness is telling the truth on the basis of a paper record and must observe

1  the witnesses' demeanor to best ascertain their veracity - or lack thereof." *Oshodi v. Holder*, 729

2  F.3d 883, 892 (9th Cir. 2013) (internal citation omitted). *See also See United States v. Howell*, 231

3  F.3d 615, 621 (9th Cir. 2000) (evidentiary hearing required where defendant demonstrates that a

4  significant disputed factual issue exists); *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995)

5  ("There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the

6  witness's credibility").

7  　　During the evidentiary hearing in this matter, the Court had the opportunity to listen to the

8  testimony of all witnesses, to observe and evaluate each witness' demeanor while testifying, and to

9  weigh each witness' credibility.  Having done so, the Court finds the testimony of Detectives Sylva,

10  Balonek, and McHale credible.

11  　　　**B.　　Initial Stop**

12  　　Defendant submits that he was lawfully on the Del Monte property and, therefore, he should

13  not have been stopped as probable cause did not exist to arrest him.  Docket No. 38 at 3.  The United

14  States responds that, when Defendant was initially stopped, he was not yet under arrest.  Docket No.

15  63 at 4.  Rather, the United States submits, Defendant was stopped for investigation.  *Id.*

16  　　An investigatory detention, a brief seizure by police based on reasonable suspicion of

17  criminal activity, is a "narrowly drawn exception to the probable cause requirement of the Fourth

18  Amendment." *Terry v. Ohio*, 392 U.S. 1, 26 (1968).  The Fourth Amendment permits investigatory

19  stops when law enforcement officers have a "reasonable suspicion" that criminal activity "may be

20  afoot." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc) (internal

21  quotation marks omitted); *see also Terry*, 392 U.S. at 30.  "[R]easonable suspicion exists when an

22  officer is aware of specific, articulable facts which, when considered with objective and reasonable

23  inferences, form a basis for particularized suspicion." *United States v. Montero-Camargo*, 208 F.3d

24  1122, 1129 (9th Cir. 2000) (en banc).  The police may stop an individual reasonably suspected of

25  criminal activity, question him briefly, and perform a limited pat-down frisk for weapons. *Terry*,

26  392 U.S. at 22-24.  The *Terry* Court emphasized the importance of balancing "the need to search (or

27  seize) against the invasion which the search (or seizure) entails. *Id.* at 21 (*quoting Camara v. Mun.*

28

1   *Court*, 387 U.S. 523, 534 (1967)).   Under this balancing approach, important government interests

2   can justify a brief investigatory detention on less than probable cause.   *Terry*, 392 U.S. at 21.

3          Reasonable suspicion may not be based on "broad profiles," "overbroad generalizations," or

4   "a prefabricated or recycled profile of suspicious behavior[.]" *United States v. Sigmond-Ballesteros*,

5   285 F.3d 1117, 1121, 1124, 1126 (9th Cir. 2002) (internal quotation marks omitted).   However, a

6   stop may be founded on reasonable suspicion despite a possible innocent explanation for every

7   police observation.   *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir.2000).   Moreover, given

8   that the standard for reasonable suspicion is "a particularized and objective basis for suspecting the

9   person stopped of criminal activity[,]" the "quantum of proof needed for reasonable suspicion is less

10  than a preponderance of evidence, and less than probable cause."   *Id.* (internal quotation marks

11  omitted).   The "reasonable-suspicion standard is not a particularly high threshold to reach," although

12  more than a "mere hunch" is required.   *Valdes-Vega*, 738 F.3d at 1078 (internal quotation marks

13  omitted).

14         Courts making reasonable suspicion determinations "must look at the 'totality of the

15  circumstances' of each case to see whether the detaining officer has a 'particularized and objective

16  basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see also*

17  *United States v. Cortez*, 449 U.S. 411, 417-18(1981) (based on the "whole picture[,] the detaining

18  officers must have a particularized and objective basis for suspecting the particular person stopped

19  of criminal activity").   An officer "who lacks probable cause, but whose 'observations lead him

20  reasonably to suspect' that a particular person has committed, is committing, or is about to commit

21  a crime, may detain that person briefly in order to 'investigate the circumstances that provoke

22  suspicion.'" *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (*quoting United States v. Brignoni-*

23  *Ponce*, 422 U.S. 873, 881 (1975)).

24         While detaining officers may "draw on their own experience and specialized training to make

25  inferences from and deductions about the cumulative information available to them that might well

26  elude an untrained person," *Arvizu*, 534 U.S. at 273 (internal quotation marks omitted), their ability

27  to rely on information known only by other officers is limited.   The collective knowledge doctrine

28  "allows courts to impute police officers' collective knowledge to the officer conducting a stop,

search, or arrest." *United States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010).  The Ninth Circuit recognizes only two situations in which the collective knowledge doctrine may be used.  First, it applies "where law enforcement agents are working together in an investigation but have not explicitly communicated the facts each has independently learned." *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007).  Even when certain information giving rise to reasonable suspicion or probable cause is not actually given to the detaining officer, some communication among officers is required.  *Id*. at 1032-33 ("cases suggest a limited requirement that there be a communication but not necessarily the conveyance of any actual information among officers").  This communication requirement serves to "distinguish officers functioning as a team from officers acting as independent actors who merely happen to be investigating the same subject."  *Id*. at 1033 (internal quotation marks and brackets omitted).  Second, the doctrine applies "where an officer ... with direct personal knowledge of all the facts necessary to give rise to reasonable suspicion ... directs or requests that another officer ... conduct a stop, search or arrest."  *Id*. at 1033.  "In both situations, collective knowledge may be imputed only if there has been some communication among agents." *Villasenor*, 608 F.3d at 475 (internal quotation marks omitted).

The court must, therefore, determine whether Defendant's investigatory detention was based on reasonable suspicion.  Whether a person has been seized for purposes of the Fourth Amendment is a mixed question of law and fact.  *United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994).

The Ninth Circuit defines "reasonable suspicion" as "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *United States v. Rojas-Millan*, 234 F.3d 464, 468-69 (9th Cir. 2000) (*quoting United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000)).  A police officer "is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also 'be grounded in objective facts and be capable of rational explanation.'" *Lopez-Soto*, 205 F.3d at 1105 (*quoting United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996)).  If an officer does not have reasonable suspicion, and the stop therefore violates the Fourth Amendment, any evidence obtained as a result of the stop must be suppressed as fruit of the

1   poisonous tree.  *United States v. Thomas*, 211 F.3d 1186, 1192 (9th Cir. 2000) (*citing Wong Sun v.*
2   *United States*, 371 U.S. 471, 484-85 (1963)).

3   In this case, the testimony established that search warrants were being executed on several
4   locations, including the Del Monte residence, for marijuana grows.  A search warrant had been
5   executed on a separate residence that day and  a marijuana grow had been located at that residence,
6   which was owned by the same person who owned the Del Monte residence.  Also, an electrical bill
7   for the Del Monte residence was found during the search of the prior residence.

8   Prior to setting up the Del Monte surveillance, a detective spoke with neighbors, who stated
9   that an Asian male, approximately 40-50 years old, was coming and going from the Del Monte
10  residence during the day, staying at the residence for only small amounts of time.  The neighbors
11  further stated that they smelled a "skunky" smell coming from the residence, and that the smell had
12  not been there before the current occupants took control of the residence.

13  Officers were conducting surveillance at the Del Monte residence until the search warrant
14  could be executed at that location, because other officers were still processing the prior scene.
15  Officers wanted to make sure that no one was able to destroy evidence, and that no potential co-
16  conspirator would flee.  During the surveillance, Defendant drove up in a minivan and exited the
17  driver's seat.  Ms. Tian exited the passenger seat, entered the driver's seat, and drove away.  Ms.
18  Tian drove very slowly, as if she was killing time, to Walmart.  Defendant went through the gate and
19  toward the residence.  After a few minutes, he left and walked away from the property.  Detectives
20  Sylva and McHale stopped Defendant after he walked away from the property.  Detective McHale
21  moved Defendant a half block from the stop in case anyone involved with the property came upon
22  the scene, both for the integrity of the investigation and for the safety of the officers involved.  The
23  questions that Detective McHale asked Defendant were proper within the context of an investigatory
24  stop, and the stop was limited in time.

25  The Court finds, in looking at the totality of the circumstances, that officers clearly had
26  reasonable suspicion that criminal activity was afoot, which justified an investigatory stop.  Moving
27  Defendant a half block from the location was necessary, as the testimony showed, for the integrity
28  of the investigation and the safety of the officers.  Further, Detective McHale limited the movement

1   of Defendant to a location very close to where he was stopped.  The Court therefore finds that neither

2   the investigatory stop of Defendant, nor the movement of Defendant from the scene of his stop

3   violated the Fourth Amendment.

4       **C.    Arrest**

5       Defendant next claims that officers lacked probable cause to arrest him.  Docket No. 38 at

6   3.  Defendant states that he was at the Del Monte property solely to check on his father's dogs, and

7   that he did not live at the property or have keys to the locked property.  *Id*. at 4.  Defendant further

8   submits that the bill for the Del Monte property that was found at the prior property searched that

9   night was not in his name.  *Id*.  Finally, Defendant submits an affidavit of Ms. Tian stating that she

10  and Defendant traveled to the Del Monte property to check on the dogs, that she dropped Defendant

11  off and drove to Walmart at his request to buy dog food, and that she had never been inside the Del

12  Monte property and had no knowledge of illegal activity occurring there.[5]  *Id*. at 14.  Defendant

13  therefore submits that his arrest violated his Fourth Amendment rights.  *Id*. at 4.

14      The United States responds that, shortly after Defendant was detained, police learned that he

15  was "the son of the man who had been arrested earlier that day related to a grow operation of more

16  than 500 plants" at the location that had been searched earlier.  Docket No. 63 at 8.  Further, the

17  United States submits that officers learned from Ms. Tian at the same time that Defendant had told

18  her to drop him off at the Del Monte house and drive away but stay in the area.  *Id*. at 8.  The United

19  States also submits that Ms. Tian told officers that she knew that marijuana grows existed at the Del

20  Monte residence, as well as two other houses.  *Id*.  Finally, the United States submits that Defendant

21  admitted he knew about the grow operation in the Del Monte house.  *Id*.  The United States contends

22  that the facts learned during the investigatory stop of Defendant, combined with the other facts of

23  the investigation, established probable cause for his arrest.  *Id*.

24

25

26      [5]Though Defendant submitted Ms. Tian's affidavit with his motion, he did not call her to
    testify at the evidentiary hearing on this motion.  The Court, therefore, cannot evaluate her demeanor
27  or her credibility and places little weight on her affidavit.  *See Mejia*, 69 F.3d at 315("There can be
    no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's
28  credibility").

1    The Fourth Amendment protects the "right of the people to be secure in their persons, houses,
2    papers, and effects, against unreasonable searches and seizures."  A warrantless arrest by a law
3    enforcement officer is reasonable under the Fourth Amendment where "there is probable cause to
4    believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146,
5    152 (2004). *See also Michigan v. Summers*, 452 U.S. 692, 700 (1981); *United States v. Watson*, 423
6    U.S. 411, 417-424 (1976).  Whether probable cause exists depends upon the reasonable conclusion
7    to be drawn from the facts known to the arresting officer at the time of the arrest.  *Maryland v.*
8    *Pringle*, 540 U.S. 366, 371 (2003).

9    "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy
10    information sufficient to lead a person of reasonable caution to believe that an offense has been or
11    is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th
12    Cir. 2007) (citing *Beck v. Ohio*, 379 U.S. 89, 91(1964).  The Ninth Circuit has additionally defined
13    probable cause as follows: when "under the totality of circumstances known to the arresting officers,
14    a prudent person would have concluded that there was a fair probability that [the defendant] had
15    committed a crime." *United States v. Smith*, 790 F.2d 789, 792 (9th Cir.1986).  While conclusive
16    evidence of guilt is of course not necessary under this standard to establish probable cause, "[m]ere
17    suspicion, common rumor, or even strong reason to suspect are not enough." *McKenzie v. Lamb*,
18    738 F.2d 1005, 1008 (9th Cir.1984) (internal citation omitted).

19    Probable cause is an objective standard and, therefore, the arresting officers' subjective
20    intention is immaterial in judging whether their actions were reasonable for Fourth Amendment
21    purposes.  *Lopez*, 482 F.3d at 1072.  *See also Devenpeck*, 543 U.S. at 153 ("an arresting officer's
22    state of mind (except for the facts that he knows) is irrelevant to the existence of probable
23    cause....[H]is subjective reason for making the arrest need not be the criminal offense as to which
24    the known facts provide probable cause." (citations omitted)).  Further, "an officer need not have
25    probable cause for every element of the offense." *Gasho v. United States*, 39 F.3d 1420, 1428 (9th
26    Cir. 1994).

27    A person's mere presence or "mere propinquity to ... criminal activity does not, without more,
28    give rise to probable cause." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).  The Ninth Circuit has

1    distinguished the "mere presence" doctrine from cases in which the "facts and circumstances ...

2    support an inference that [an] individual is connected to the proximate criminal activity." *United*

3    *States v. Buckner*, 179 F.3d 834, 839 (9th Cir. 1999).

4          "Under the collective knowledge doctrine, in determining whether probable cause exists for

5    arrest, [Courts] look to 'the collective knowledge of all the officers involved in the criminal

6    investigation[.]'" *Torres v. City of Los Angeles*, 548 F.3d 1197, 1207 (9th Cir. 2008) (citing *United*

7    *States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir.2007).

8          Here, the evidence showed that neighbors had told police that the Del Monte residence had

9    a "skunky" smell that had only existed since the current occupants moved in, and that an Asian male

10   around the same age as Defendant came and went numerous times, staying only a small amount of

11   time each visit.  Further, during the execution of a search warrant earlier that day at another residence

12   owned by the same owner as the Del Monte residence and found to have a marijuana grow, police

13   found an electric bill for the Del Monte residence.

14         During the surveillance of the Del Monte residence, officers observed Defendant drive up

15   in a minivan and exit the driver's seat.  Ms. Tian then exited the passenger seat, entered the driver's

16   seat, and drove away.  Ms. Tian drove very slowly, as if she was killing time, to Walmart.  Defendant

17   went through the gate and toward the residence.  After a few minutes, Defendant left and walked

18   away from the property.  Detectives Sylva and McHale stopped Defendant after he walked away

19   from the property.

20         Detective Balonek stopped Ms. Tian in the Walmart parking lot, after she drove slowly

21   through the parking lot and passed several open parking spots before parking in one.  Ms. Tian told

22   officers that she dropped Defendant off at the residence to feed the dogs and went to Walmart to buy

23   dog food.  She also told them that Defendant told her to drive away, but to remain in the area.  Ms.

24   Tian also stated that she knew there was marijuana inside the Del Monte residence.

25         Defendant told officers that his father, who had been arrested earlier in the day in relation to

26   the grow operation at the prior residence searched, asked him to feed his dogs at the Del Monte

27   residence.  He said that Ms. Tian dropped him off at the Del Monte residence to feed the dogs and

28   then left the area to go to work.  Defendant did not have keys to either the main residence or the

house behind the residence where his father lived.  He did not have dog food, but said there was dog food inside the residence.  Defendant admitted that he did not go inside the residence or feed the dogs, and that he had walked away from the residence when the officers stopped him.  Defendant could not explain how he intended to feed the dogs since he had no keys, nor could he explain why he left the property without feeding the dogs when feeding the dogs was his alleged sole reason for being at the property.  Defendant further could not explain how he intended to leave the area, given his statement that Ms. Tian had gone to work.  Defendant later told Detective Bachman that he knew that marijuana was being grown inside the Del Monte residence.

Throughout this time, Detective Sylva communicated all of his observations over the radio to the other officers.  Further, Detective Balonek provided Detective Bachman with the exact contents of Ms. Tian's statements over the phone.  Finally, Detective McHale turned Defendant over to Detective Bachman after speaking with him and briefed Detective Bachman about what Defendant had said.

In looking at all of the evidence known to the officers as a whole at the time of Defendant's arrest, the Court finds that "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." *Smith*, 790 F.2d at 792.  The Court therefore finds that probable cause existed for Defendant's arrest. *See also United States v. Valencia–Amezcua*, 278 F.3d 901, 906–08 (9th Cir. 2002) (finding probable cause based on defendant's physical proximity to the crime scene and suspicious conduct in helping to attempt to conceal a secret door).

**D**.    **Statement**

Defendant asks this Court to suppress his statement because he was subjected to custodial interrogation, and may not have recieved the proper warnings.  Docket No. 38 at 5-7.  Defendant further submits that he speaks "only broken English, and his understanding of English is weak at best." *Id*. at 7.  Finally, Defendant submits that the United States must prove that his statement was voluntary. *Id*. at 7-8.

The United States responds that Defendant was properly advised of his rights and stated that he understood them.  Docket No. 63 at 9.  The United States further contends that Defendant had an

1   extended conversation with law enforcement, in English.  *Id*.  Finally, the United States submits that

2   Defendant's statement was voluntary.  *Id*. at 11.

3        Interrogation initiated by law enforcement officers after a suspect "has been taken into

4   custody or otherwise deprived of his freedom of action in any significant way" must be preceded by

5   *Miranda* warnings.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *accord United States v. Wilson*,

6   666 F.2d 1241, 1246 (9th Cir. 1982).  "In order to combat [the pressures inherent in custodial

7   interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination,

8   the accused must be adequately and effectively apprised of his rights."  *United States v. Williams*,

9   435 F.3d 1148, 1151 (9th Cir. 2006) (quoting *Miranda*, 384 U.S. at 467).

10       The "touchstone" for *Miranda* warnings is whether the suspect is in custody when

11  interrogated.  *United States v. Barnes*, 713 F.3d 1200, 1205 (9th Cir. 2013) (citing *Rhode Island v.

12  Innis*, 446 U.S. 291, 300 (1980)).  To determine whether an individual was in custody, the Court

13  must examine the totality of the circumstances.  *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

14  The test is whether "a reasonable innocent person in such circumstances would conclude after brief

15  questioning [that] he or she would not be free to leave."  *United States v. Bassignani*, 575 F.3d 879,

16  883-84 (9th Cir. 2009) (quoting *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir.1981)).  A

17  *Miranda* warning functions both to reduce the risk that an involuntary or coerced statement will be

18  admitted at trial and to implement the Fifth Amendment's self-incrimination clause.  *Id*. at 1151.

19  Thus, if a suspect in custody does not receive an adequate warning effectively apprising him of his

20  rights before he incriminates himself, his statements may not be admitted as evidence against him.

21  *Id*. at 1152.  In determining whether a suspect was in custody, "the ultimate inquiry is simply

22  whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated

23  with formal arrest."  *Stansbury v. California*, 511 U.S. 318, 322 (1994) (*quoting California v.

24  Beheler*, 463 U.S. 1121, 1125 (1983)).

25       "Waivers of *Miranda* rights need not be explicit; a suspect may impliedly waive the rights

26  by answering an officer's questions after receiving *Miranda* warnings."  *United States v.

27  Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir.) amended, 416 F.3d 939 (9th Cir. 2005).  "For

28  a waiver of rights to be valid it must be voluntarily, knowingly, and intelligently given.  Whether

there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of defendant." *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998) (en banc) (internal quotation marks and citations omitted). "A waiver is knowing and intelligent if, under the totality of the circumstances, it is made with a 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Doe*, 155 F.3d at 1074 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

In *Rodriguez-Preciado*, the Court found that the Spanish-speaking defendant indicated that he understood his rights in English after they were explained to him and that there was "no indication by any of the officers that [the defendant] had difficulty understanding English nor that the officers had trouble understanding [the defendant's] English." 399 F.3d at 1127-1128. The Court therefore found that Defendant understood his rights and knowingly and intelligently waived them. *Id*. at 1128.

Further, the government bears the burden of proving a confession is voluntary by a preponderance of the evidence. *United States v. Jenkins*, 958 F.2d 934, 937 (9th Cir. 1991) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)); *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). A voluntary statement is "one that is the product of a rational intellect and free will." *United States v. Kelley*, 953 F.2d 562, 564 (9th Cir. 1992), *overruled on other grounds by United States v. Dearing*, 9 F.3d 1428 (9th Cir. 1993) (citing *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960)). "In evaluating voluntariness, the 'test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Male Juvenile,* 280 F.3d 1008, 1022 (9th Cir. 2002) (citing *Derrick,* 924 F.2d at 817); *Dickerson v. United States,* 530 U.S. 428, 434 (2000).

The Court finds that the evidence adduced at the evidentiary hearing established that Defendant's entire encounter with Detective McHale occurred in the English language. Detective McHale read Defendant his *Miranda* rights from his Department-issued card. He told Defendant that he had the right to remain silent, anything he said could be used against him in a court of law, he had the right to have an attorney present during questioning, if he could not afford an attorney one would be appointed for him, and he need not answer any questions without his attorney. After reading the

rights, Detective McHale asked Defendant if he understood them.  Defendant said yes, and that he wanted to continue the conversation.  Defendant gave no indication that he did not understand his rights; in fact, he was excited to talk.

While Detective McHale asked Defendant most questions, Defendant understood his questions and had no trouble answering them; however, when he asked Defendant questions that could incriminate him, such as questions about not feeding the dogs and leaving the house on foot, Defendant acted a little confused. Defendant spoke in English the entire time, and never spoke in any other language.  The conversation between the two was "clear," while it was obvious that English is not Defendant's first language, the two had no problems communicating.

Detective McHale did not have a weapon out during the conversation.  He did not make any threats or promises to Defendant in order to get Defendant to make a statement.  Defendant appeared agitated, but not intoxicated or under the influence of any controlled substance.

The Court finds, based on the evidence adduced at the evidentiary hearing, that Defendant was properly advised of his *Miranda* rights, and that he knowingly and intelligently waived them. The Court further finds that Defendant was excited to talk to law enforcement, and that the entire conversation occurred in English.  Defendant and Detective McHale had no trouble communicating in English.  The Court therefore finds that Defendant's statement to law enforcement was voluntary.

## **RECOMMENDATION**

Based on the foregoing and good cause appearing therefore,

IT IS RECOMMENDED that Defendant Bing Han's Motion to Suppress, Docket No. 38, be **DENIED**.

DATED this 7th day of March, 2016.

NANCY J. KOPPE
United States Magistrate Judge

1

**<u>NOTICE</u>**

2      Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must**

3 **be in writing and filed with the Clerk of the Court within 14 days of service of this document.**

4 The Supreme Court has held that the courts of appeal may determine that an appeal has been waived

5 due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142

6 (1985). This Circuit has also held that (1) failure to file objections within the specified time and (2)

7 failure to properly address and brief the objectionable issues waives the right to appeal the District

8 Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951

9 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir.

10 1983).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28